# UNITED STATES *v.* SOUTHERN PACIFIC RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 25. Argued April 18, 19, 1901.—Decided January 27, 1902.

This case is a continuation of *Southern Pacific Railroad Company* v. *United States*, 168 U. S. 1, brought to quiet the title of the Government to lands within the limits of the forfeited grant to the Atlantic and Pacific Railroad Company. The questions in this case arise between the United States and parties holding title or claiming rights to lands by deed from or contract with the railroad company. The title of the company having been adjudged void, the acts of March 3, 1887, 24 Stat. 556; of February 12, 1896, 29 Stat. 6; of March 2, 1896, 29 Stat. 42, were passed for the pur-

pose of upholding the titles of parties who, in good faith, had purchased lands from railroad companies which, though supposed to be part of their grants, proved not to be so.  The first section of the act of March 2, 1896, reads: "But no patent to any lands held by a *bona fide* purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed."  *Held:* 1. That the facts bring this case within the provisions of that section; and that the Circuit Court rightly confirmed the title to lands patented under it; 2. That the unpatented lands were so situated with reference to the constructed road of the Southern Pacific, as to be within the scope of its grant, and that the act was not intended to be limited to cases of purchases from the railroad company prior to its date ; 3. That while the act was remedial, and to be liberally construed, yet to sustain the purchase in controversy in this case as one made in good faith, would ignore the plainest provisions of law in respect to *bona fide* purchasers, and would uphold almost any kind of speculative purchase.

THIS is a continuation of the case which was before this court and decided in 1897.   168 U. S. 1.   It was brought to quiet the title of the Government to some seven hundred thousand acres of land within the limits of the forfeited grant to the Atlantic and Pacific Railroad Company, and claimed by the defendants under certain junior grants to the Southern Pacific Railroad Company.   The decree in the Circuit Court quieted, as against the Southern Pacific Company, the title of the Government to all the lands.   The other defendants asserted title or claimed rights to certain portions of the land by virtue of conveyances from or contracts with the Southern Pacific Company, and the decree provided: "Nor shall this decree in anywise affect any rights which the defendants, or any of them, other than the said Southern Pacific Railroad Company, now have or may hereafter acquire in, to or respecting any of the lands hereinbefore described, in virtue of the act of Congress entitled 'An act to provide for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands and for other purposes,' approved March 3, 1887."

This decree was affirmed by this court so far as the Southern Pacific Company as well as the trustees in its mortgage were concerned, the court saying, in reference to that portion of the decree just quoted (p. 65):

" Instead of leaving undetermined the matters in dispute between the United States and the defendants other than the Southern Pacific Railroad Company, the Circuit Court should have determined, by its final decree, what rights those defendants have by virtue of the above act of March 3, 1887, 24 Stat. 556, c. 376, in the lands of any of them now in dispute and claimed by the United States.   The effect of the decree is to leave undetermined the question whether the defendants who claim under the Southern Pacific Railroad Company are protected by that or any other act of Congress.   The Government was entitled to a decree quieting its title to all the lands described in its pleadings, except those, if any, that are protected, in the hands of claimants, by acts of Congress.   *United States* v. *Winona & St. Peter Railroad*, 165 U. S. 463; *Winona & St. Peter Railroad* v. *United States*, 165 U. S. 483.   But as the Government has not appealed, the decree cannot be reversed for the error of the Circuit Court in not finally disposing of the issues between the United States and the individual defendants who claim under the Southern Pacific Railroad Company.

" The result is that the decree must be affirmed in all respects as to the Southern Pacific Railroad Company, as well as to the trustees in the mortgage executed by that company, and affirmed also as to the other defendants, subject, however, to the right of the Government to proceed in the Circuit Court to a final decree as to those defendants, and it is so ordered."

On the return of the mandate to the Circuit Court the United States dismissed their bill against the defendants other than the railroad company and its mortgage trustee without prejudice as to all, except certain specified tracts, amounting in the aggregate to about 52,600 acres, of which amount 9284 were patented by the United States to the Southern Pacific, the patents bearing date March 29, 1876, April 4, 1879, December 27, 1883, and January 9, 1885, and 43,315 remained unpatented.   In respect to these tracts the case proceeded to final hearing, which resulted in a decree in favor of the defendants, 88 Fed. Rep. 832, confirming their title to the lands patented, and adjudging them *bona fide* purchasers within the meaning of the act of Congress of March 3, 1887, of the lands not patented.   From

this decree the United States appealed to the Court of Appeals for the Ninth Circuit, which affirmed the decree, 98 Fed. Rep. 45, and thereupon the United States brought the case here on appeal.

*Mr. Joseph H. Call* for appellants.

*Mr. Maxwell Evarts* and *Mr. M. D. Brainard* for appellees.

Mr. Justice Brewer, after making the above statement, delivered the opinion of the court.

The questions now to be determined arise between the United States and parties holding title or claiming rights to lands by deed from or contract with the railroad company. The title of the company having been adjudged void, the defendants rely upon the acts of Congress of March 3, 1887, c. 376, 24 Stat. 556, and February 12, 1896, c. 18, 29 Stat. 6, and March 2, 1896, c. 39, 29 Stat. 42. These acts were passed for the purpose of upholding the titles of parties who in good faith had purchased from railroad companies lands, which though supposed to be part of their grants, proved not to be so. This legislation was fully considered in *United States* v. *Winona &c. Railroad Company,* 165 U. S. 463, and *Winona &c. Railroad Company* v. *United States,* 165 U. S. 483, and any further discussion of its scope is unnecessary. In respect to it we said:

"The act of 1896, confirming the right and title of a *bona fide* purchaser, and providing that the patent to his lands should not be vacated or annulled, must be held to include one who, if not in the fullest sense a '*bona fide* purchaser,' has nevertheless purchased in good faith from the railroad company.

\*      \*      \*      \*      \*      \*      \*      \*

"Our conclusion is that these acts operate to confirm the title to every purchaser from a railroad company of lands certified or patented to or for its benefit, notwithstanding any mere errors or irregularities in the proceedings of the Land Department, and notwithstanding the fact that the lands so certified or patented were, by the true construction of the land grants, although

within the limits of the grants, excepted from their operation, providing that he purchased in good faith, paid value for the lands, and providing, also, that the lands were public lands in the statutory sense of the term, and free from individual or other claims."   p. 481.

In the present case the deeds to the patented lands were executed by the company at different dates, commencing July 23, 1885, and ending July 19, 1892.   These lands were apparently within the grant made to the Southern Pacific by the act of March 3, 1871, c. 122, 16 Stat. 573 ; that is, they were public lands in the statutory sense of the term along the line of the Southern Pacific as authorized by that act and within the place or indemnity limits of the grant.   The road had been constructed, and the Land Department of the United States, the tribunal charged with the duty of administering the public lands, had decided that the company had earned the lands and had caused patents therefor to be issued to it.   No third party claimed title ; either the Government or the company was the owner.   Under those circumstances the purchasers bought the lands ; bought them in good faith ; paid value for them.

These facts bring the case within the first section of the act of March 2, 1896, as heretofore construed by us : " But no patent to any lands held by a *bona fide* purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed."

Against this conclusion, it is contended that purchasers with notice that the Government questioned the company's title to these lands are not *bona fide* purchasers.   And counsel say that " in the year 1886 every Department of the Government began to operate to protect the title of the United States to these lands, and in every public way gave notice to the world of the rights of the Government to them," enumerating the act of Congress of July 6, 1886, forfeiting the grant to the Atlantic and Pacific Company ; various rulings of the Interior Department, from that on June 7, 1887, (*Gordon v. Southern Pacific R. R. Co.*, 5 Land Dec. 691,) to the date of the last deed, to the effect that the lands granted to the Atlantic and Pacific were not operated upon by the subsequent grants to the South-

ern Pacific, and were by the forfeiture act restored to the pub-
lic domain ; and the commencement of the several suits by the
Government to establish its title to these lands and others sim-
ilarly situated.   Counsel also refer to *Winona &c. Railroad Co.*
v. *United States, supra,* in which it was held that one cannot
claim to be a purchaser in good faith from a railroad company
if at the time he has notice of facts outside the records of the
Land Department disclosing a prior right in some third party.

But we do not thin⸍ a mere change in the opinions of the
officers of the Government, as to the validity of the company's
title, although made known to parties proposing to purchase
from such company, is sufficient to take away from them the
protection of good faith.   A party may have notice of con-
flicting claims and still, in the exercise of an honest judgment
⸍s to the rightful owner, buy property and pay for it, and be
acting in good faith. · So far as suits are concerned, all the
decisons of the courts had be⁀n up to the date of the last deed
in favor of the title of the company.   Thus the purchasers had
not merely the action of the Land Department in issuing the
patents, but all past decisions of the courts, justifying their
conclusions.   The conditions are not like those in *Winona &c.
R. R. Co.* v. *United States.*   That was a suit to cancel a certifi-
cation of a tract of land made for the benefit of a railroad
company and also a deed from it.   The certification was
wrongfully made, and the company in fact took no title.   The
purchaser sought protection under these statutes. · Before any
certification, or any pretence of right in the company, as well
as at the time of the conveyance to its grantee, there was and
had been for many years a party in actual possession of the
land under a title *prima facie* regular and valid, and it was
held that the grantee, charged with notice of that occupancy
and that claim of title, could not be adjudged a *bona fide* pur-
chaser from the railroad company within the meaning of the
statute.   "The statute was not intended to cut off the rights
of parties continuing after the certifica⸍ion, and of which at
the time of his purchase the purchaser had notice.   Only the
purely technical claims of the Government were waived."
Nothing of that kind appears here; no independent and out-

side facts are shown, no title in any third party—simply a change of opinion on the part of the officers of the Government as to the validity of the title of the Southern Pacific Company, and it would be harsh, indeed, if remedial statutes like these were shorn of their beneficent application by reason of the fact that the officials of the Government had changed their views of the law. We think the Circuit Court was right in confirming the title to the lands patented.

With reference to the unpatented lands, they, like the former, were so situated with respect to the constructed road of the Southern Pacific as to be apparently within the scope of its grant, and the same general comments are appropriate here as in reference to the patented land. The act of 1896 refers only to lands patented or certified, and the parties who contracted with the company for unpatented lands must rely for protection upon the act of 1887. Most of the transactions in respect to them were after the date of this act, and it is contended that it is not prospective in its operation and only purports to protect prior transactions.

The ruling of the Land Department has been to the contrary effect. In *Sethman* v. *Clise*, 17 Land Dec. 307, a purchase from the railroad company was made prior to the act of 1887, but after the act the purchaser conveyed to a transferee, and it was held that the latter was entitled to relief under the statute.

" The act directed the manner of making adjustments, and it was the evident intention of Congress, as expressed in the fifth section of the act, that when, in the adjustment of these grants, it was ascertained that land had been bought from the railroad companies for which they could convey no good title, such buyers or their transferees, if *bona fide*, should be allowed to purchase the tracts claimed by them. And it can make no difference, I think, whether a transferee, otherwise entitled to purchase, bought the land before or after the day of the approval of the act, if it was originally purchased in good faith from any said company." p. 312.

In *Andrus et al.* v. *Balch*, 22 Land Dec. 238, was presented the case of a purchase from the railroad company after the act of March 3, 1887, and it was held that that did not prevent the

operation of the act. The same proposition was reaffirmed in *Briley* v. *Beach et al.*, 22 Land Dec. 549; *Carlton Seaver et al.*, 23 Land Dec. 108; *Grandin et al.* v. *La Bar*, 25 Land Dec. 194; *Neilson* v. *Central Pacific Railroad Company*, 26 Land Dec. 252. There has been no decision to the contrary. This uniform ruling and practice of the Land Department would, in case of doubt, be of great weight in determining the true construction of the act. *Knowlton* v. *Moore*, 178 U. S. 41, 56, 92; *Fairbank* v. *United States*, 181 U. S. 283–306.

But the act itself bears upon its face evidence that it was not intended to be limited to cases of purchases from the railroad company prior to its date. While the first section directs the Secretary of the Interior " to immediately adjust " the several land grants, section 3 provides " that if, in the adjustment of said grants, it shall appear that the homestead or preëmption entry of any *bona fide* settler has been erroneously cancelled on account of any railroad grant or the withdrawal of public lands from market, such settler upon application shall be reinstated in all his rights and allowed to perfect his entry by complying with the public land laws." This seems to imply an intent that all mistakes of the nature referred to which shall have occurred up to the very completion of the adjustment may be rectified. Section 4 makes provision for the issue of patents to certain purchasers from railroad companies, providing proof shall be made " within such time and under such rules as may be prescribed by the Secretary of the Interior, after the grants respectively shall have been adjusted." While other sections may not be so specific, yet placing them alongside of those from which quotations have been made it is reasonable to hold that the act applies not merely to transactions had before its date, but to any had before the time of final adjustment. In this case the several grants to the Southern Pacific have not yet been finally adjusted. Further, it must be borne in mind that this is a remedial statute, and is to be construed liberally, and so as to effectuate the purpose of Congress and secure the relief which was designed, and the mere date of the transaction between the purchaser and the railroad company is not of itself vital in de-

termining whether there is or is not an equity in behalf of the purchaser. As said in Potter's Dwarris on Statutes, 231:

" A remedial act shall be so construed as most effectually to meet the beneficial end in view, and to prevent a failure of the remedy. As a general rule, a remedial statute ought to be construed liberally. Receiving an equitable, or rather a benignant interpretation, the letter of the act will be sometimes enlarged, sometimes restrained, and sometimes it has been said the construction made is contrary to the letter; which should be read—*ultra* the letter, and confined to ancient statutes."

See also the letter of Attorney General Garland to the Secretary of the Interior, in response to a question as to the true construction of this act. 6 Land Dec. 275.

" The whole scope of the law from the second to the sixth section, inclusive, is remedial. Its intent is to relieve from loss settlers and *bona fide* purchasers who, through the erroneous or wrongful disposition of the lands in the grants, by the officers of the Government, or by the railroads, have lost their rights or acquired equities. . . . The fifth section expressly refers to such lands as had been sold, which had not been conveyed ' to or for the use of such companies.' It is not required that the sale by the railroad companies shall have been made on its part in good faith, but only that the purchaser shall have bought in good faith. That it was sold under a claim of the grant to another in good faith is the ground of his equity."

The remaining question arises on the ruling that one of the defendants, Jackson A. Graves, was a *bona fide* purchaser, and entitled to the protection of the fifth section of the act of March 3, 1887, and affects something like thirty-five thousand acres. These were purchased from the railroad company in 1885 by the Atlantic and Pacific Fibre Importing and Manufacturing Company, Limited, a corporation organized under the laws of Great Britain. This suit was commenced on May 17, 1890. On September 25, 1891, an amended bill of complaint was filed, in which the Fibre Company was made party defendant. Its answer was filed March 14, 1892. On January 27, 1893, it conveyed the lands to Graves, who thereafter caused himself to

be substituted for it as party defendant.  Said section five, so far as is applicable, reads:

"Sec. 5. That where any said company shall have sold to citizens of the United States, or to persons who have declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the *bona fide* purchaser thereof from said company to make payment to the United States for said lands at the ordinary government price for like lands, and thereupon patents shall issue therefor to the said *bona fide* purchaser, his heirs or assigns."

The Fibre Company was an alien, and therefore not within the terms of the section.  Graves, it is true, was a citizen, and the ruling of the department has been that the right of purchase from the Government conferred by this section is not limited to the immediate purchaser from the company, but may be exercised by a subsequent grantee, who has the necessary qualifications, and that in such case it is immaterial what were the qualifications of such purchaser.  See letter of Secretary Noble to the Commissioner of the General Land Office, (11 Land Dec. 229,) in which the Secretary said:

"It can make no difference, in my judgment, 'whether the applicant is the immediate purchaser from the company, or a purchaser one or more degrees removed.  If he is a *bona fide* purchaser of the land and has the required qualifications as to citizenship he is within the intendment of the statute, and if he be not the original purchaser from the company it is immaterial what the qualifications of his immediate grantor, or the intervening purchasers, may have been.  If his immediate grantor was a foreigner, and his purchase was simply for the purpose of acquiring title from the Government for the benefit of the foreigner, he would not be a *bona fide* purchaser, and would not therefore come within the terms of the act." *Union Pacific Ry. Co.* v. *McKinley,* 14 Land Dec. 237 ; *Union Colony* v. *Fulmele,*

16 Land Dec. 273; *Sethman* v. *Clise*, 17 Land Dec. 307; *Ray* v. *Gross*, 27 Land Dec. 707.

Within the scope of these rulings Graves is entitled to the protection of the statute if he can be considered a *bona fida* purchaser. He bought *pendente lite*, and while he testified that he purchased in good faith and for value, that he was holding the lands under the conveyances, and had paid all legal taxes and assessments levied and assessed since the deeds, he further tesfied as follows:

"Q. 19. Did you buy these lands in good faith? A. Yes, expecting to make title to them.

"Q. 20. And do you hold them as said purchaser and as a citizen of the United States? A. I do.

"Q. 21. And as an innocent purchaser? A. Well——

"Q. 22. For value received? A. I hold them for a valuable consideration.

"Q. 23. Well, do you claim to be an innocent purchaser of said lands, under the act of Congress of March 3, 1887? A. I think I am protected under the act of Congress of 1887. I would like to understand this 'innocent.' What you mean by that? Of course I have notice of the defect—I have notice of the Congressional action taken, and of the pendency of this suit; had it when I bought. Outside of that I consider myself an innocent purchaser. Of course I had that notice of that suit. There is no use denying that. At the same time, I understand—I think I understand, the act of Congress of 1887, and I think I am protected under it."

Cross-examination:

"Q. 24. How much did you pay the Atlantic and Pacific Fibre Importing and Manufacturing Company for these lands? A. I have not paid them anything in coin. But I have agreements with them which are the equivalent of the coin.

"Q. 25. What is the nature of the agreements? A. I am to protect them in the title, that is, protect them in their original purchase money; make what I can out of it over and above that.

"Q. 26. And devote your legal services to that end? A. Yes. They have to have somebody on this end."

Now while the statute is, as we have stated, remedial and to be liberally construed in order to carry out the purpose of its enactment, yet to sustain this purchase as one made in good faith would ignore the plainest provisions of law in respect to *bona fide* purchasers and would uphold almost any kind of speculative purchase. Congress expressly limited the privileges granted by the act of 1887 to citizens of the United States or those who had declared their intention to become such. It excluded aliens, and in so doing acted in harmony with the general scope of public land legislation. True in the act of 1896 in respect to patented lands it recognized aliens as entitled to the benefits of a *bona fide* purchase, but the fact that in a later statute, and in respect to a different class of lands, it extended certain privileges, is no reason for ignoring the limitations contained in this act as applied to the lands covered by it.

While according to the construction of the Land Department the grantee of a purchaser from the railroad company is entitled to invoke the protection of this statute yet it is one who is himself a *bona fide* purchaser and not one whose " purchase was simply for the purpose of acquiring title from the Government for the benefit of the foreigner." It seems to us that the testimony plainly discloses a purely speculative transaction. Graves paid nothing. His agreement was, as he says, to protect the company in its title, or rather in its purchase money, and then he would make what he could over and above that. He was not buying with the purpose of owning the land but was simply engaged in an effort to secure to the original purchaser from the railroad company the money which it had invested in its purchase, advancing, it is true, in that effort, some money in the way of taxes and devoting his legal services to that end, and hoping to make a profitable speculation out of the matter.

Another matter worthy of notice as tending to show a community of interest with the Fibre Company is his testimony in respect to the matter of possession. When asked, " Q. Are you in possession of the same?" he replied, " A. Well, we are exercising possession; we are keeping other people off of them. Not farming them, but—yes, we are in possession."

We do not think that defendant Graves has shown that he

was a purchaser in good faith. As to him, the decree cannot be sustained.

> *The decree of the Court of Appeals will, therefore, be affirmed in all respects except as to the lands standing in the name of Jackson A. Graves. As to those lands it will be reversed, and the case remanded to the Circuit Court for the Southern District of California, for further proceedings in conformity with this opinion.*