# CASES

## ARGUED AND DETERMINED

#### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### CHAUNCEY et al. v. DYKE BROS. et al.

(Circuit Court of Appeals; Eighth Circuit. November 28, 1902.)

#### No. 1,672.

1. BANKRUPTCY—JURISDICTION—CONFLICTING LIENS.

Where the bankrupt court has acquired the lawful custody of property to which conflicting liens attach, it has jurisdiction to determine the priorities of such liens, though the trustee has no interest in such question.

2. SAME—WAIVER OF OBJECTIONS.

A trustee in bankruptcy filed a petition asking for permission to sell, free of incumbrances, certain real estate of the bankrupt which was incumbered both by a mortgage and by mechanics' liens, and that the proceeds of the sale should stand in lieu of the property. Thereupon the mortgagees and lienholders agreed to submit the priority of their liens to the decision of the referee, and that the sale should be postponed until after such priorities had been disposed of. *Held*, that such stipulation operated as a consent on the part of the mortgagees that the property might be sold free of all liens, and gave the bankrupt court lawful custody of the same and the proceeds realized therefrom.

3. MECHANICS' LIENS—MORTGAGES—PRIORITY ON IMPROVEMENTS—USE OF BORROWED MONEY.

Acts Ark. 1895, p. 217, § 3, provides that a mechanic's lien shall attach to the buildings in preference to any prior incumbrances existing upon the land: provided, however, that where the prior incumbrance was executed to raise money with which to make such improvements then the lien should be prior to the lien given by the act. Section 10 provides that contractors for the erection of improvements must, on request, furnish to a mortgagee a full list of the claims of those laboring on an improvement or furnishing material therefor. A mortgage was executed for the purpose of securing money for improvements, but only a portion thereof went to pay for labor or material, the balance being turned over to the mortgagor, who diverted it from such purpose. *Held*, that the liens of laborers and materialmen on the improvements would be superior to that of the mortgagees, as to such portion turned over to the mortgagor.

4. SAME—PRIORITY ON LAND—DISTRIBUTION.

On a distribution of the proceeds of the property, the value of the land, on which the mortgage was an undoubted prior lien, should be applied pro rata to the payment of both portions of the mortgage.

119 F.—1

**5. SAME—ASSUMPTION OF DEBT.**

After the execution of the mortgage, the agent of the mortgagees retained the money, and material was furnished on his representation by one materialman that there was still $1,500 left, and that he would see that such material was paid for out of that fund. *Held*, that in a distribution of the proceeds of the property, including both the improvements and the land, the claim of this materialman was entitled to preference over that of the mortgagees, since, even if they were not estopped from asserting the priority of their lien, they had "assumed" the payment of the claim for the material.

Sanborn, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Arkansas.

Joe P. Matthews was adjudicated a bankrupt by the district court of the United States for the Western district of Arkansas, and in the course of such proceeding A. A. McDonald, one of the appellees, was appointed trustee of his estate. At the time of the adjudication the bankrupt owned lot 7, in block 530, in Reserve addition to the city of Fort Smith, Ark., which property was subject to a deed of trust or mortgage held by Elihu Chauncey, Charles Chauncey, and William L. Savage, as trustees, to secure a note of $4,000, dated April 28, 1899, and due April 28, 1904, to which note 10 semiannual interest coupons were attached, each ·coupon representing six months' interest on the loan. At the time of the adjudication, or shortly thereafter, certain mechanics' liens had been or were filed against the mortgaged property for materials supplied in the erection of a building thereon. One of such liens was filed by Dyke Bros., one of the appellees, another by J. M. Tenney & Co., another of the appellees. and another by H. I. Goddard, the remaining appellee. On May 4, 1900, McDonald, as trustee of the bankrupt's estate, filed a petition setting forth the incumbrances that existed upon the property, and praying for an order that he, as owner of the equity of redemption in the property, might be authorized to sell it free and clear of all liens; the proceeds received at such sale to stand in lieu of the property, and to be distributed according to the various priorities of the lien claimants as they might thereafter be determined. He also prayed that the owner of the debt secured by the deed of trust might be restrained from selling the mortgaged property in pursuance of the power of sale contained in the mortgage. After such a petition had been filed, and the parties affected thereby had been served with notice of the same, and cited to appear and show cause why the order prayed for should not be granted, they appeared before the referee in bankruptcy; whereupon the trustees in the deed of trust, namely, the present appellants, entered into an agreement with the various holders of mechanics' liens, to wit, the present appellees, to the effect that they would file with the referee in bankruptcy their respective interventions, setting up their respective claims to priority of payment, and that no injunction should be issued against the owner of the deed of trust, and that no sale of the property should be made until the rights and priorities of the respective parties had been definitely settled and determined by the referee upon said interventions. Thereupon a hearing at considerable length was had before the referee, who decided that the lien of the mortgage or deed of trust was superior to that of the mechanics' liens which had been filed against the property, and directed that the property be sold free and clear of all·liens and incumbrances by the trustee in bankruptcy. The case was then certified into the district court, and, upon a hearing before that tribunal, the action of the referee, directing that the property be sold free and clear of all liens and incumbrances, was approved. The district court decided, however, that the claim of Dyke Bros. was entitled to priority and should be paid in full; that the sum of $3,000 should next be paid to the owner of the deed of trust; and that the claims of J. M. Tenney & Co. and H. I. Goddard, the appellees, be next paid. The trustees in the deed of trust excepted to this order of the district court, and have brought the case to this court by appeal.

Homer C. Mechem and Edgar E. Bryant, for appellants.

F. A. Youmans and Ira D. Oglesby, for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first question which confronts us in this case is one of jurisdiction. The appellants urge, and such is the fact, that they did not present their claim, which was secured by a mortgage or deed of trust, for allowance against the bankrupt's estate; that the trustee in bankruptcy did not dispute the existence of the mortgage indebtedness; that the only real controversy which was tried and determined was that between the mortgagee and the mechanics' lien holders concerning their respective priorities; and that, as this was a controversy in which the bankrupt's estate was in no wise interested, the bankrupt court had no jurisdiction to determine it, and that the power to determine it could not be conferred by consent. It will be conceded that the authority to try the issue which arose between the lien claimants, and to determine their respective priorities, could only be exercised by the bankrupt court in virtue of the fact that by the proceeding in bankruptcy it had acquired the custody of the res to which the controversy related. The bankrupt court had no right to assume jurisdiction of a controversy between third parties, in which the trustee was not concerned, and decide whose claim was paramount in equity, merely because the claimants happened to be creditors of the bankrupt estate, or merely because the liens affected a part of the bankrupt's property. The bankrupt act confers no such authority. But if, in the exercise of its customary jurisdiction, the bankrupt court obtained the lawful custody of the res to which the liens related or of a fund realized from its sale, then the duty which was thereby devolved upon it, of distributing the fund among those to whom it rightfully belonged, did empower it to determine the relative priorities of the conflicting claims to the fund. A court which has lawfully acquired the custody of property or money must of necessity dispose of the same according to law; and, when conflicting claims are preferred, it is not bound to require the claimants to litigate their claims in some other forum, and to adopt the judgment of that tribunal, although it may do so, but it is at liberty to dispose of such controversies according to its own ideas of right and justice. This is one of those incidental powers which may be exercised by any court of record in the absence of an express prohibition. The jurisdictional question, therefore, resolves itself into an inquiry whether the bankrupt court acquired the lawful custody of the fund which was realized by the sale of the mortgaged property. The trustee in bankruptcy clearly had the power, acting under the directions of the bankrupt court, to sell the bankrupt's equity of redemption in the mortgaged property. He would doubtless have discharged his full duty by praying for authority to sell simply the bankrupt's equity of redemption. He saw fit, however, to ask for authority to sell the property free and clear of all liens, and in response

to such an application the mortgagees and the lien claimants appeared, and, without objecting to such order, agreed to submit their respective claims to the arbitrament and decision of the referee, and they further agreed that the sale as prayed for should be postponed until the priorities had been determined. It is obvious that there was no need of submitting and no propriety in submitting this question to the decision of the bankrupt court, unless it was for the purpose of laying the foundation for a proper distribution of the fund realized at the sale of the mortgaged property, after it had been sold free of all liens and incumbrances. Therefore the action that was taken by the appellants in this respect can be regarded in no other light than as a waiver of all objections on their part to a sale of the property free from incumbrances by the trustee in bankruptcy, and as a consent, voluntarily given, that such a sale might be made. It will not be presumed that the appellants and the appellees entered into a stipulation with intent to cast upon the bankrupt court the trial of a moot question, the decision whereof would be extra-judicial and binding upon no one. It must be presumed, on the contrary, that the parties entered into the stipulation aforesaid in good faith, with the understanding that the mortgaged property should be sold free of liens, and that the fund should be divided as the referee or the bankrupt court, after hearing the interventions, might direct. We are constrained to hold, therefore, that the parties in effect agreed that the property in question might be sold free and clear of all liens and incumbrances. This, we think, is the necessary construction which must be placed on the stipulation that was entered into before the referee. Such being the effect of the stipulation, it follows that in a controversy between a purchaser at said sale and these appellants the appellants would be estopped by their own acts from denying that the sale operated to discharge the lien of the mortgage and to transfer it to the fund realized at the sale, and we are of opinion that they cannot in this proceeding challenge the validity of the sale or deny that the proceeds of the sale came into the lawful custody of the trustee in bankruptcy and became subject to the disposition and control of the bankrupt court. The latter court, as we have already remarked, had the power to order the sale of the bankrupt's equity of redemption. The provision that at the sale the property should be sold free of all existing liens was a provision which the appellants consented might be added to the terms of the proposed sale either for their own advantage or convenience; and, even if it should be conceded that under the present bankrupt act the bankrupt court had no power to prescribe this condition without the consent of the lienors, yet, having given such consent and taken part in a long trial to determine their respective priorities, they will not now be heard to complain of an order made, or of action taken, which, if in any respect erroneous, they themselves invited. We accordingly conclude that the lower court had the power, incidental to the right of disposition of a fund that had or would come lawfully into the custody of the trustee in bankruptcy, to determine how the fund should be divided among the rival claimants.

Under the old bankrupt law it was held that a court of bankruptcy

could direct a sale of mortgaged property owned by the bankrupt, devested of all liens, and could determine the priority of liens on the incumbered property, without the consent of the lienors and against their will. Ray v. Norseworthy, 23 Wall. 128, 135, 23 L. Ed. 116. It is denied by the appellants that any such power is conferred on courts of bankruptcy by the present bankrupt law because of the omission of those provisions from which, under the old law, the authority in question was derived. But, in view of the fact that the sale in the case in hand was ordered by consent of all parties in interest, it is unnecessary, we think, to express a definite opinion with reference to the last-mentioned contention of the appellants, and none will be expressed at this time.

The only other question to be determined on this appeal is whether the lower court properly construed an act relating to mechanics' liens which was adopted in the state of Arkansas on April 20, 1895. Acts Ark. 1895, p. 217. The question arises in the following manner: When Matthews, the bankrupt, made his application to the appellants for a loan to be secured by mortgage, he represented in his application that the money was borrowed to help build a building on the mortgaged premises, to be used by himself as a wholesale grocery establishment, and that the lot on which the building was to be erected was worth $2,500, and that the value of the building would be $5,500. The money, when advanced by the mortgagees in pursuance of this application, was transferred to their agent residing at Ft. Smith, Ark., who had negotiated the loan, the mortgagees being nonresidents. On receipt of the money this agent gave the mortgagor credit therefor on his books, and as the work progressed he paid $3,000 of the money thus advanced directly to contractors, laborers, and materialmen who were engaged in erecting the building on the mortgaged premises, but he permitted the residue of the fund, to wit, $1,000, to be expended for other purposes, and that amount never was in fact applied toward the erection of the building. The lien claims that are preferred by the appellees are in the main claims for materials supplied toward the erection of the building, all of which were so supplied subsequent to the execution of the appellants' mortgage and the transfer of the fund to their agent. A part of the claim of one lienholder (H. I. Goddard) appears to be on account of services rendered in drawing plans and specifications for the building in question, the amount of that item being $174.30. It may be that the lien for this item of his account had attached before the mortgage was executed, but as the lower court treated the whole of Goddard's lien claim as being subsequent in point of time to the mortgage, and as Goddard did not appeal, and as the fund is probably adequate to pay Goddard's claim in full, if the decree of the lower court was in other respects right, we shall proceed on the assumption that all of the mechanics' liens became attached to the property subsequent to the execution of the mortgage, and shall dispose of the case on that assumption.

The lien law of the state of Arkansas that was enacted on April 20, 1895, supra, by its first section, gave to every mechanic, builder, artisan, workman, laborer, or other person who should do or per-

form any work upon, or furnish any materials, etc., for, any building, erection, or improvement upon land, or upon any boat or vessel, or for repairing the same, under a contract with the owner thereof or his agent or contractor, upon compliance with the provisions of the act, a lien upon such building, erection, or improvement, and upon the land belonging to such owner, on which the same was situated, to the extent of one acre; or, if the building was upon any lot of land in a town or city, then a lien was given upon the building or improvement, and upon the lot or lots of land upon which the same were situated.

The second section of the act defined the extent of the lien aforesaid, declaring, in substance, that the lien should only bind such right, title, and interest as the person contracting for the erection of the building or improvement possessed.

The third section of the act, over which the controversy in this instance arises, was as follows:

"The lien for the things aforesaid, or work, shall attach to the buildings, erections or other improvements, for which they were furnished or work was done, in preference to any prior lien or incumbrance or mortgage existing upon said land before said buildings, erections, improvements or machinery were erected or put thereon, and any person enforcing such lien may have such building, erection or improvement sold under execution, and the purchaser may remove the same within a reasonable time thereafter: provided, however that in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements or buildings, then said liens shall be prior to the lien given by this act."

The fourth section of the act related to liens upon leasehold premises.

The fifth section of the act was as follows:

"The lien for work and materials as aforesaid shall be preferred to all other incumbrances which may be attached to or upon such building, bridges, boats or vessels or other improvements, or the ground, or either of them, subsequent to the commencement of such buildings or improvements."

The sixth, seventh, eighth, and ninth sections of the act contained provisions relative to the steps to be taken by lien claimants to secure the benefits of the act. The provisions thereof have no special bearing upon the present controversy.

The tenth section of the act contained a provision, in substance, that any one interested in buildings or grounds on which improvements were being made, "as mortgagee or trustee," might at any time apply to the contractor or subcontractor for a list of all parties doing work or furnishing materials for such improvements, and for a statement of the amount due to each of such persons. It further declared that, if the contractor or subcontractor refused to give correct information on such points when it was applied for, he should be guilty of a misdemeanor, and punished by a fine not exceeding $500. The remaining provisions of the act have no special bearing upon the existing controversy.

On this state of facts, the question arose in the lower court whether, as respects the $1,000 of the mortgage indebtedness that had not been applied by the mortgagees' agent towards the erection of the

building on the demised premises, but had been expended for other purposes, the mortgagees were entitled, by virtue of the proviso to section 3 of the mechanics' lien law, supra, to priority of payment over the mechanics' lien claimants. The lower court, in an able and carefully prepared opinion (reported in Re Matthews, 109 Fed. 603, 610), decided this question in the negative, holding, in substance, that when a person advances money, taking security therefor in the form of a mortgage, which was borrowed by the mortgagor for the professed purpose of erecting a building or improvements on the mortgaged premises, he can claim no priority of lien over persons who have performed labor or furnished materials for the erection of such building or improvements subsequent to the execution of the mortgage, except for such part of the money so advanced by the mortgagee as was actually expended in the erection of such building or improvement. The majority of the members of this court are of opinion that the conclusion reached by the learned judge of the lower court was right, and that it should be affirmed. The lien law in question is a remedial statute. It was enacted to secure to laborers, artisans, and others who perform labor or furnish materials for the erection of buildings on the land of others, payment for such services and materials, by giving them a lien on the structures which they have helped to create, instead of compelling them to rely merely on the personal security of the debtor. That such laws are fair and just, and that they also tend to encourage the erection of buildings by insuring payment for the labor and materials that are expended in their erection, has been generally recognized. Davis v. Bilsland, 18 Wall. 659, 661, 21 L. Ed. 969. As such laws are remedial in their nature and are prompted by a wise policy, they should be liberally construed in favor of the class of persons for whose benefit they were intended.

The first section of the act now under consideration declares that those who do work or furnish materials for the erection of an improvement on land shall be entitled to a lien therefor on the land and the improvement. This is a general rule applicable to all cases, and the burden is upon one who disputes the existence of a lien for work done or materials furnished for the purpose aforesaid to make good such contention. Section 3 of the act deals with the subject of priorities, when there are other liens of a different character, the rule prescribed being that, in so far as the improvement is concerned, mechanics' liens shall be preferred over all liens existing on the land even before the improvements were erected, and that they may be sold and removed for the benefit of the laborer and materialman. Then follows the proviso that when a prior lien, by way of mortgage, is given for the purpose of raising money to erect improvements, it shall be entitled to priority. In framing this section of the act the legislature evidently had in mind the comparative equities of one who supplies labor or material for improvements on land and one who furnishes money which is actually expended for the erection of such improvements. These equities were regarded as being equal; hence the proviso declared, in substance, that the lien which was prior in point of time should be preferred. That

portion of the section, however, which precedes the proviso, clearly recognizes the fact that the equity of one who simply loans money secured by a mortgage on land, which is not used to improve it, is inferior to that of a materialman or laborer who subsequently contributes to the erection of improvements on the land under a contract with the owner, thereby enhancing its value; and the latter lien, as respects the improvement, is preferred. We are constrained to believe that the legislature did not intend to prefer the lien of the mortgagee over that of a laborer or materialman when the former loans his money on the representation that it is borrowed for the purpose of improving the mortgaged property, unless it is in fact expended for that purpose. The contrary view of the statute, that the mere expression by the mortgagor of a purpose to use the money borrowed to improve the mortgaged premises entitles the mortgagee to a preference, would, in effect, nullify that part of section 3 which precedes the proviso, as is very clearly shown in the opinion of the lower court (109 Fed. 311, 312); for, as the proviso does not specify any time, prior to the commencement of an improvement, within which the money must be loaned by the mortgagee, it follows that if it is loaned years before the improvement is commenced, and not a dollar enters into the improvement, nevertheless the mortgagee may successfully assert his priority on the ground that when the loan was made the mortgagor represented that it was to be used for the purpose specified in the proviso. This seems to be a very unreasonable interpretation of the statute, and one that would enable a mortgagee to defeat an equity which the statute clearly recognizes as superior, and an equity which it was designed to protect. Such an interpretation of the statute can hardly be supposed to have been within the contemplation of the lawmaker, when we reflect that the general purpose of the act was to afford greater security to laborers and materialmen, and to restrict, in a measure, the rights of other lienholders. The lien law in question was framed, we think, with reference to the known habits of men who loan money on the security of real estate, with the understanding that it is to be used to enhance its value by improving it. In such cases, as the legislature well knew, the lender usually sees to it that the money is used as the borrower promised to use it. The mortgagees did so in the case in hand; they evidently construed the statute as we construe it; they paid the money, not to the mortgagor to be expended as he thought best, but to laborers and materialmen, except the sum of $1,000, which amount the mortgagor managed to obtain and used for a different purpose. Therefore, when the proviso gives a preference to mortgagees if they loan money for the purpose of improving mortgaged property, it refers to an executed purpose, and not merely to a purpose expressed by the mortgagor at the time of the loan, which is not carried into effect. If the purpose of the loan is not consummated, the equity of the lender is inferior to that of a mechanic's lien holder.

This view of the statute is confirmed by the tenth section of the act, the substance of which is stated above. By that section the mortgagee is given power to call upon contractors for the erection of an

improvement, at any time, for the names of all materialmen and laborers and the amount due to each, and the contractor is required, under a heavy penalty, to give correct information; the evident purpose of this provision being to enable the mortgagee to expend the money which he loans, exclusively for the payment of such bills. But the act contains no corresponding provision enabling a material-man or a laborer to call upon a mortgagee for information concerning the purpose for which the money secured by his mortgage was loaned and compelling the latter to give such information. He can keep his own counsel, stand by and see materialmen and laborers expend their substance in making the mortgaged property more valuable, and then come forward and assert that by virtue of an oral representation made by the borrower, which was known only to himself, he is entitled to priority. We are of opinion that the legislature did not intend to place laborers and materialmen in that situation.

We are aware that some courts have at times expressed, in strong terms, the necessity of reading and enforcing statutes literally without regard to consequences. Some of these utterances have been called to our attention. But this doctrine of literalism which clings to the letter of a statute and ignores its purpose is not well calculated to promote the ends of justice, and has not been viewed with favor, at least by the federal courts. It is not the duty of a court of justice to perpetuate mistakes inadvertently made by the lawmaker by a blind adherence to the letter of a law, when the purpose of the law is apparent. A legislative enactment should always be so construed as to give effect to the intention of the lawmaker, when it is discernible, even if the language employed to express the intent is in some respects inapt and faulty. This is the primary canon of construction, which dominates all others, inasmuch as construction consists solely in finding out the intent of the lawmaker, with the aid of all such light on the subject as can be obtained. Legislative bodies are not always fortunate in the use of language, but, if careful attention is paid to all the provisions of a statute as well as to the conditions which led to its enactment, little difficulty will generally be experienced in ascertaining what was intended. When the purpose is discovered it should be given effect, since whatever is within the intention of the lawmaker is as much within the statute as if it was within the letter. U. S. v. Freeman, 3 How. 556, 565, 11 L. Ed. 724; U. S. v. Babbitt, 1 Black, 55, 61, 17 L. Ed. 94. It sometimes happens that the language employed in one paragraph of a statute acquires a new meaning that no one can dispute when read in connection with other provisions of the act, or in connection with prior legislation on the same or a cognate subject, or in the light of the end to be accomplished or the circumstances that gave birth to the enactment. In interpreting and enforcing a statute, therefore, no court should overlook these means of information merely out of deference to particular words of the act which, through haste or inadvertence, may not fully or accurately express its true purpose. Nor are the courts in the habit of giving effect to laws strictly according to the letter, ignoring all other considerations. They will sometimes supply exceptions to a general rule, where none is expressed, as in Hanger v. Abbott,

6 Wall. 532, 18 L. Ed. 939, where an exception was implied, although none was expressed, thereby taking a case out of the operation of the statute of limitations. In like manner they will supply words where they seem to have been unintentionally omitted, as in Kennedy v. Gibson, 8 Wall. 498, 506, 19 L. Ed. 476, where the word "by" was supplied so as to permit actions in the federal courts to be brought "by" national banks as well as "against" them. Previous legislative enactments and definitions of terms therein contained that have been repealed may also be consulted for the purpose of ascertaining what is meant by like terms as used in subsequent enactments. Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. 396, 27 L. Ed. 1030. And where, by certain clauses of a statute relating to the removal of cases to the federal court, the right had been confined to nonresident defendants, thereby establishing a legislative policy on the subject, it was held by this court that the same restriction would be implied in another clause of the act, although it was not in terms expressed. Thurber v. Miller, 14 C. C. A. 432, 67 Fed. 371. The decisions in Fisk v. Henarie, 142 U. S. 459, 12 Sup. Ct. 207, 35 L. Ed. 1080, and McDonnell v. Jordan, 178 U. S. 229, 20 Sup. Ct. 886, 44 L. Ed. 1048, also illustrate in a striking manner to what extent the express words of a statute will be ignored when it is deemed necessary to do so to give effect to the legislative purpose. In those cases the court was dealing with the second section of the judiciary act of 1887 (25 Stat. 433, 435, c. 866), which permits the removal of causes from the state to the federal court on the ground of prejudice or local influence "at any time before the trial thereof." Notwithstanding the use of the latter words, the supreme court decided, basing its ruling on previous legislation and also on the general purpose of the act to restrict jurisdiction of the federal courts, that cases could not be removed on the ground of prejudice and local influence unless the removal was applied for, not as the words of the act declared, "at any time before the trial," but only in the event that the application for a removal was made before or at the term at which the cause could be first tried. In the case of United States v. Southern Pac. R. Co., 184 U. S. 49, 56, 57, 22 Sup. Ct. 285, 46 L. Ed. 425, the supreme court further enforced the doctrine, quoting with approval a paragraph from Potter, Dwar. 231, that a court should always so construe a remedial statute as to give effect to the intent of the lawmaker, even if in doing so it is necessary to go beyond the letter of the statute. Indeed, it may be stated generally that no inaccuracy in the use of language, or grammatical errors, or the omission of words or phrases, or the use of the wrong word, will serve to defeat the intent of the lawmaker when the intent can be definitely ascertained. Bish. Cont. § 383.

Without pursuing the subject at greater length, it will suffice to say that, after a careful study of the lien law in question, we are of opinion that it was not the intention of the legislature to give mortgagees a preference over the holders of mechanics' liens whose liens are subsequent in point of time, unless the money which they advance is actually expended in the erection of the improvement to which the controversy relates. A mortgagee who does not see to it that the

money advanced is thus expended is in no better situation than one who loans money without any representation on the part of the borrower respecting the use that will be made of it.

With respect to the claim of Dyke Bros., the lower court found that they had furnished materials for the erection of the building in question on the representation of the mortgagees' agent that he had $1,500 of the mortgagees' money still in his hands unexpended, and that he would see that they were paid for the materials which they supplied out of that fund. For this reason its order of distribution, as heretofore stated, directed that Dyke Bros. should be paid, in preference to the mortgagees, out of the proceeds realized from the sale of the mortgaged property. This finding by the lower court is amply sustained by the testimony, and we would not be warranted in finding to the contrary upon the evidence contained in the present record. Moreover, as the order which was made by the lower court for the distribution of the fund will avoid circuity of action and discharge an obligation to pay the claim of Dyke Bros., which the mortgagees by their agent (to whom the mortgage, as it seems, has now been assigned) assumed, we think that the order, in so far as it concerns the claim of Dyke Bros., should not be disturbed, even if it be true that the facts as found by the trial court are not sufficient to estop the appellants from asserting the priority of their mortgage lien. The facts as found by the lower court do show that the mortgagees are bound to see that the claim of Dyke Bros. is paid in full, and the order accomplishes that object without the necessity of further litigation.

In framing the order for the distribution of the fund, the lower court seems to have overlooked the fact that the third section of the mechanics' lien law, to which the present discussion relates, gives to laborers and materialmen a preference over a prior incumbrance only as respects the improvements that are erected and not as respects the land. It may be that the sale will produce enough to discharge all the liens, and it may be that the circumstance last mentioned, though fully understood by the trial court, was not regarded as of any special importance for that reason. If enough will not be realized from the sale to discharge the mortgage in full according to the priorities as they have been declared, then the order of distribution as made should be modified so as to secure to the mortgagees, except as to Dyke Bros., their priority as respects the land. Possibly it may be necessary, before the sale, to ascertain the comparative value of the land and improvements as a means of determining the sum realized from each. If such a course is found to be necessary, the sum realized from the land should be applied pro rata so as to reduce that part of the mortgage debt amounting to $3,000, which is entitled to priority, as respects the improvements, as well as that part of the mortgage debt, to wit, $1,000, which is not entitled to such priority. If the fund is adequate to pay all the liens, no comparative valuation of the land and improvements would seem to be necessary, as no one will be injured by the enforcement of the existing order.

Finding no other error in the order, it will be affirmed except in the respect last mentioned, and the record will be remitted to the

lower court, with directions to modify its decree as herein explained, if it shall be found necessary to do so for the preservation of the full rights of the appellants.

SANBORN, Circuit Judge (dissenting). I am unable to concur in the view of the majority that it is the duty of this court to substitute in the act of the legislature of Arkansas of 1895 the use of a mortgage loan in the place of the purpose of it as the test of the superiority of its lien.

The portion of that act which controls this question reads: "That in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements or buildings, then said lien shall be prior to the lien given by this act." Acts Ark. 1895, pp. 217, 220. The opinion of the majority makes it read: "That in all cases where said prior lien or incumbrance or mortgage was given or executed for money or funds which were actually used to make such erections, improvements or buildings, then said lien shall be prior to the lien given by this act;" or "that in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements or buildings, then said lien shall be prior to the lien given by this act, except in cases in which the money is not used for the purpose for which it was raised." But what warrant have the courts to substitute use for purpose in the statute of Arkansas or to add this exception to the act of its legislature? The legislature of Arkansas said nothing about the use or application of the money raised by these mortgages. That body declared that the purpose of the loan should determine its superiority. Why should the courts strike out the test which the legislature provided and insert another? It is said that this ought to be done to effect the intention of the legislature. But is the intention of that body in adopting a statute to be determined by the opinions of judges as to what it might or ought to have said, or is it to be found in that which is clearly expressed? Is it permissible for the courts to presume or believe that the legislature intended one thing when it clearly expressed another, and are courts allowed to substitute their presumption and belief for the actual legislation? The general rule that it is the purpose of the construction of statutes to learn and give effect to the intention of the legislative body which enacted them is familiar. But this rule is nothing but a broad general proposition, which is limited and qualified by the established rules and principles of the law that peremptorily prohibit the courts from imputing to any legislative body an intention, or from construing or interpolating into a plain statute the expression of an intention, which the legislature has not fairly set forth in the law which it has enacted. The proviso of section 3 which has been quoted is the only portion of this statute which states, or undertakes to state, the test which shall determine the superiority of the liens of prior mortgages over the subsequent liens of mechanics, and this proviso unequivocally declares that that test shall in all cases be the purpose for which the mortgage

was given. The provision of section 10 that any one interested as mortgagee or trustee may apply to a contractor or a subcontractor for a list of all the parties doing work or furnishing material for improvements and for a statement of the amount due to each of such persons does not seem to me to indicate that the legislature intended by that section to change the test it had plainly declared in section 3. If that body had such an intention it could easily have declared it, and section 10 contains no such declaration. In my opinion that, section has two other objects: (1) To enable mortgagees whose mortgages were not given for the purpose of raising money to make the improvements to protect themselves against subsequent liens, an end which they could only attain by paying off such liens or causing them to be paid; and (2) to furnish a ready way for mortgagees to ascertain the names of the necessary parties to suits for the foreclosure of their mortgages. Whatever may have been its purpose, however, it contains nothing inconsistent with the plain declaration of the proviso of section 3, and, on familiar principles, an inconsistent intention and expression ought not to be construed into section 10 for the purpose of creating a conflict between that section and section 3, which the terms of those sections do not disclose. There is nothing in any of the sections of the act, nothing in the first, second, third, fourth, fifth, or tenth sections, to which the majority refer, which declares in terms that the purpose of the loan shall not be the test of its superiority or that the use of its proceeds shall be. There is nothing in any of these sections or in any part of the act inconsistent with the unambiguous declaration of the proviso of section 3, and therefore nothing, in my opinion, to warrant the repeal or modification of the plain words of that section. The following considerations persuade me to this conclusion:

1. It is the intention expressed in the statute, and that alone, to which courts may give effect. They may not assume or presume purposes and intentions that the terms of the statute do not indicate or express, and then enact provisions to accomplish these supposed intentions. A secret intention cannot be legally interpreted into a statute which is plain and unambiguous, and which does not express it. The legal presumption is that the legislature expressed its intention and its whole intention, that it intended what it expressed, and that it intended nothing more. U. S. v. Wiltberger, 5 Wheat. 76, 94, 5 L. Ed. 37; Bennett v. Worthington, 24 Ark. 487, 494; Tynan v. Walker, 35 Cal. 634, 95 Am. Dec. 152; Alexander v. Worthington, 5 Md. 471; Maxwell v. State, 40 Md. 293; Smith v. State, 66 Md. 215, 7 Atl. 49; Johnson v. Southern Pac. Co. (C. C. A.) 117 Fed. 462; Insurance Co. v. Champlin (C. C. A.) 116 Fed. 858; Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 52 C. C. A. 25, 114 Fed. 77, 81, 57 L. R. A. 696; Railway Co. v. Bagley, 60 Kan. 424, 431, 56 Pac. 759; Woolsey v. Ryan, 59 Kan. 601, 54 Pac. 664; Davie v. Mining Co., 93 Mich. 491, 53 N. W. 625, 24 L. R. A. 357; Vogel v. Pekoc, 157 Ill. 339, 42 N. E. 386, 30 L. R. A. 491; Campbell v. Lambert, 36 La. Ann. 35, 51 Am. Rep. 1; Turnpike Co. v. Coy, 13 Ohio St. 84; Stensgaard v. Smith, 43 Minn. 11, 44 N. W. 669, 19 Am. St. Rep. 205.

In U. S. v. Wiltberger, 5 Wheat. 76, 94, 5 L. Ed. 37, Chief Justice Marshall said:

"The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity or of kindred character with those which are enumerated."

It would not be less dangerous to strike down any or all liens of mortgages which are superior in date and right to mechanics' liens, and which are not denounced by a statute, because they are within the mischief which it was intended to remedy, or within its reason and are of a kindred character with those which it clearly enumerates and invalidates.

In Maxwell v. State, 40 Md. 293, the supreme court of that state said:

"Courts must not, even to give effect to what they may suppose to be the intention of the legislature, put upon the provision of a statute a construction not supported by the words, even although the consequence should be to defeat the object of the act."

In Alexander v. Worthington, 5 Md. 472, that court said:

"The courts cannot imagine an intent, and bend the letter of the act to it."

And again in Smith v. State, 66 Md. 215, 7 Atl. 49, it said:

"Even when a court is convinced that the legislature really meant and intended something not expressed by the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language, which is free from ambiguity."

In Tynan v. Walker, 35 Cal. 634, the supreme court of California declared that the argument that the legislature intended to include a case that was not within the terms of a statute because it was within its reason was

—"A most dangerous and pernicious mode of reasoning, which amounts to judicial legislation, and overturns the maxim that courts are authorized to declare the law only, and not to make it. If they may add at all to the exceptions provided for in the statutes, under the pretense that the case before them is of equal equity with those given in the statutes, who is to fix the limit to their interpolation or establish the line between legislative and judicial function? If they may add one to the list of excepted cases, by a parity of reasoning they may add another, and so on until the entire body of the statute has become emasculated and the will of the judiciary substituted for that of the legislature. * * * It is an universal principle of construction that courts must find the intent of the legislature in the statute itself. Unless some ground can be found in the statute for restraining or enlarging the meaning of its general words, they must receive a general construction, and the courts cannot arbitrarily subtract from or add thereto."

And the supreme court of Arkansas, whose legislature enacted this statute, declared in Ex parte Trapnall, 6 Ark. 9, 12, 42 Am. Dec. 676, that:

"Effect must, if possible, be given to the object and intention of the legislature, but to ascertain that object and intention we must first have recourse

to the language employed in the act, and, if that be clear and unambiguous, we can proceed no further in the inquiry."

Apply the rule which these authorities announce to the statute in hand. It declares without uncertainty or doubt that the liens of prior mortgages whose proceeds were raised for the purpose of making improvements upon the mortgaged property are superior to subsequent mechanics' liens. It says "that in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements or buildings, then said lien shall be prior to the lien given by this act." The contention is that it intended to except from that declaration the liens of all such prior mortgages the proceeds of which were not actually used to make the improvements. In other words, the argument is that the legislature enacted that the purpose of the loan should be the test of its superiority when it intended to provide that the use of the loan should constitute that test. But the difference between purpose and use is patent in common parlance, in legislation, and in the law. Statutes which authorize the issue of municipal bonds invariably specify the purpose for which they may be issued and sold. If issued for that purpose they are valid; if for any other purpose, they are void. But it is a well-established principle, which has been uniformly and repeatedly sustained by the decisions of this court, that the fact that the proceeds of such bonds have not been used for the purpose for which they have been raised constitutes no defense to the bonds. The test of their validity is the purpose for which the proceeds were obtained, not the use to which they were applied. City of Huron v. Second Ward Sav. Bank, 30 C. C. A. 38, 43, 86 Fed. 272, 277, 49 L. R. A. 534; National Life Ins. Co. v. Board of Education of City of Huron, 10 C. C. A. 637, 644, 62 Fed. 778, 784; West Plains Tp. v. Sage, 16 C. C. A. 553, 566, 69 Fed. 943, 946; Commissioners v. Beal, 113 U. S. 227, 240, 5 Sup. Ct. 433, 28 L. Ed. 966; Cairo v. Zane, 149 U. S. 122, 137, 13 Sup. Ct. 803, 37 L. Ed. 673; Maxcy v. Williamson County Court, 72 Ill. 207. The legislature of Arkansas could not have been ignorant of the difference between purpose and use when it enacted this statute. It had undoubted power to choose whether the purpose of raising the proceeds of the mortgage loans or their use should determine the superiority of the liens of the mortgages. It chose and clearly provided that the purpose should constitute the test. This was a positive declaration that the use should not constitute it, for the expression of one alternative is the exclusion of the other, and it seems to me that it left no tenable ground for the position that the legislature intended that any other test than that which it plainly expressed should determine the superiority of the liens of such mortgages. The legal presumption becomes conclusive that the legislature meant what it so clearly expressed, and that it meant nothing else.

2. Where the legislature makes no exception from the plain terms of a statute, the conclusive legal presumption is that it intended to make none, and the courts may not lawfully do so. Railway Co. v. B'Shears, 59 Ark. 244, 27 S. W. 2; Shreve v. Cheeseman, 69 Fed. 785, 786, 16 C. C. A. 413, 414; Madden v. Lancaster Co., 12 C. C. A.

566, 573, 65 Fed. 188; Morgan v. City of Des Moines, 8 C. C. A. 569, 60 Fed. 208; McIver v. Ragan, 2 Wheat. 25, 29, 4 L. Ed. 175; Bank v. Dalton, 9 How. 522, 528, 13 L. Ed. 242; Vance v. Vance, 108 U. S. 514, 521, 27 L. Ed. 808. In Railway Co. v. B'Shears, 59 Ark. 237, 244, 27 S. W. 2, the supreme court of Arkansas said:

"Where the statute makes no exceptions, the courts can make none. It might be very just and reasonable and right that the statute should make an exception, such as is contended it does make, or ought to be construed to make; but this was within the power of the legislature, 'and its exercise of the power cannot be restrained or varied by the courts to subserve' convenience, to relieve from hardships, or from requirements that seem unreasonable, or even absurd, where the language is plain and unambiguous. Sims v. Cumby, 53 Ark. 421, 14 S. W. 623; McGaughey v. Brown, 46 Ark. 37; Railway Co. v. Hagan, 42 Ark. 122; Railroad Co. v. Carlley, 39 Ark. 246."

By the proviso of section 3 the legislature enacted that the liens of all prior mortgages which were given for the purpose of raising money to make improvements on the mortgaged property should be superior to the subsequent liens of laborers and materialmen. It made no exception of mortgages the proceeds of which were not actually used for the purpose for which they were raised. It therefore intended to make none, and it is not the province of the courts to do so. The legislature declared that the liens of all mortgages given for the purpose of raising money to make improvements should be superior to the subsequent liens of mechanics. That declaration seems to me to conclusively negative the assumption and decision of the majority that the legislature intended to and did provide that the liens of some of these mortgages should be superior, while the liens of others of them should be inferior to the subsequent liens of mechanics.

3. Construction and interpretation have no place or office where the terms of a statute are clear and certain and its meaning is plain. When its language is unambiguous, and its meaning evident, it must be held to mean what it plainly expresses, and no room is left for construction. In such a case argument from the reason, spirit, or purpose of the legislation, from the mischief it was intended to remedy, from history or analogy, for the purpose of searching out and justifying the interpolation into the statute of new terms, and for the accomplishment of purposes which the lawmaking power did not express, are worse than futile. They serve only to raise doubt and uncertainty where none ought to exist, to confuse and mislead the judgment, and to pervert the statute. Lake Co. v. Rollins, 130 U. S. 662, 670, 9 Sup. Ct. 651, 32 L. Ed. 1060; U. S. v. Hartwell, 6 Wall. 396, 18 L. Ed. 830; Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; Knox Co. v. Morton, 15 C. C. A. 671, 673, 68 Fed. 787, 789; Railroad Co. v. Sage, 17 C. C. A. 553, 565, 71 Fed. 40, 47; Webber v. Railway Co., 38 C. C. A. 79, 83, 97 Fed. 140, 144; Swarts v. Siegel (C. C. A.) 117 Fed. 13; Johnson v. Southern Pac. Co. (C. C. A.) 117 Fed. 462; U. S. v. Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304; Bedsworth v. Bowman, 104 Mo. 44, 49, 15 S. W. 990; Warren v. Paving Co., 115 Mo. 572, 576, 22 S. W. 490; Davenport v. City of Hannibal, 120 Mo. 150, 25 S. W. 364; Witte v. Koeppen, 11 S. D. 598, 79 N. W. 831, 74 Am. St. Rep. 826; Johnson v. Railroad Co., 49 N. Y. 455, 462.

In Lake Co. v. Rollins, 130 U. S., at page 670, 9 Sup. Ct. 652, 32 L. Ed. 1060, the supreme court in discussing this question said:

"We are unable to adopt the constructive interpolations ingeniously offered by counsel for defendant in error. Why not assume that the framers of the constitution and the people who voted it into existence meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain, and in such a case there is a well-settled rule which we must observe. The object of construction, applied to a constitution, is to give effect to the intent of its framers and of the people in adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument. To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. Newell v. People, 7 N. Y. 9, 97; Hills v. City of Chicago, 60 Ill. 86; Scott v. Reid, 10 Pet. 524, 9 L. Ed. 519; Leonard v. Wiseman, 31 Md. 201, 204; People v. Potter, 47 N. Y. 375; Cooley, Const. Lim. 57; Story, Abr. Const. § 400; City of Beardstown v. City of Virginia, 76 Ill. 34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. U. S. v. Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304; Doggett v. Railroad Co., 99 U. S. 72, 25 L. Ed. 301."

If the English language contains any words or terms which would express more clearly than those used in the act of 1895 the thought that the purpose for which a prior mortgage or incumbrance was given shall be the sole test of its superiority over subsequent mechanics' liens, they do not occur to me. This seems to me to be the evident and the only meaning of the words of the statute when they are taken in their natural and ordinary signification. They say "that in all cases where said prior lien or incumbrance or mortgage was given or executed for the purpose of raising money or funds with which to make such erections, improvements, or buildings, then said lien shall be prior to the lien given by this act." In my opinion, the courts ought not to repeal this law and enact another to the effect that the purpose of the giving of the prior mortgages shall not be the test of their superiority, and that the use of their proceeds or some other fact or circumstance shall be. No such duty is imposed upon them, nor is any such legislative power conferred upon the judiciary.

4. The common or the general law is not further abrogated by a modifying statute than the clear import of its language necessarily requires. Such a statute should be strictly interpreted, and should not be extended by construction to subjects or classes which it does not clearly include. Shaw v. Bank, 101 U. S. 557, 565, 25 L. Ed. 892; Fitzgerald v. Quann, 109 N. Y. 441, 445, 17 N. E. 354; Brown v. Barry, 3 Dall. 365, 367, 1 L. Ed. 638; Johnson v. Southern Pac. Co. (C. C. A.) 117 Fed. 462. Under the common law and under the statutes of Arkansas as they read before this act of 1895 was passed, the liens of all mortgages and incumbrances upon real estate before im-

provements were commenced thereon took precedence in right as in time to the subsequent liens of mechanics. The act of 1895 subordinated the liens of that class of these prior mortgages and incumbrances which were not given for the purpose of raising money to make improvements upon the incumbered property to subsequent mechanics' liens. To that extent it abrogated the common law and the general law. It ought not to be construed to abrogate or modify that law further than its language necessarily requires. That language does not require the abrogation of the former law to such an extent that the liens of that class of mortgages which were given for the purpose of raising money to make improvements, but the proceeds of which were not used for that purpose, shall be subordinated to subsequent liens of mechanics in addition to the class specified in the statute, and it ought not to be given that effect.

5. An ex post facto construction of a plain statute which destroys prior rights vested under the law as it reads is as abhorrent to justice and reason and as inadmissible as an ex post facto law. Johnson v. Southern Pac. Co. (C. C. A.) 117 Fed. 462. The mortgagees in this case invested their money in this mortgage for the purpose specified in this statute, which plainly declares that the liens of mortgages given for that purpose shall be superior to the subsequent liens of mechanics. A construction which repeals that declaration establishes a new test for the superiority of such liens, and strikes down those honestly secured under the statute, without any notice or premonition that any new test not mentioned in this law would be prescribed by the courts, has all the pernicious attributes of an ex post facto law, and is violative of the basic principles of Anglo-Saxon jurisprudence.

In view of the unquestioned rules and principles to which reference has now been briefly made; because it is the intention expressed in the statute, and that alone, to which courts may lawfully give effect, and this statute does not express an intention to except from its terms prior mortgages given for the purpose of raising money to make improvements upon the mortgaged property the proceeds of which were not used for that purpose; because the legislature has made no exception from the plain terms of the statute, and when it makes none the conclusive legal presumption is that it intended to make none, and the courts ought not to do so; because the terms of this statute are plain and unambiguous, and for that reason it is not subject to construction; because it abrogates a part of the common and of the general law, its language does not require the abrogation of that part of the law which gives superiority to the liens of prior mortgages given for the purpose of raising money to make improvements on the mortgaged property the proceeds of which were actually used for other purposes, and a statute which changes the general law may not be construed to modify it further than the clear import of its language necessarily requires; and because the construction which would repeal the test of the purpose of a loan prescribed by a statute and enact the test of its use to destroy mortgages previously given in reliance upon the plain declaration of the law that the purpose, and not the use, is the test, has all the vice of an ex post facto law,—the conclusion is irresistibly forced upon my mind that the exception to the terms of this statute

which the opinion of the majority inserts ought not to be construed into the law by the courts, and the statute should stand and be enforced as it was enacted by the legislature, with its plain declaration that the sole test of the superiority of liens upon lands before improvements are made is the purpose for which the debts they secure were incurred, and not the use made of their proceeds.

My conclusion relative to the question which has been discussed is based upon the reasons which have now been given. The statute seems to me too plain for interpretation, and arguments from the mischief to be remedied and the probable intention of the legislature seem to me ineffectual. It may not, however, be out of place to suggest that it is exceedingly doubtful whether the change in the terms of the statute, that the use of the proceeds of loans instead of the purpose for which the proceeds were obtained shall be the test of the superiority of the mortgages which secure them, will not prove very deleterious to the interests of mechanics, laborers, and materialmen who contribute to the construction of improvements upon mortgaged real estate. Under the test which the statute prescribes they have notice of the existence of prior incumbrances from the records, and by a simple inquiry of the holders of these instruments and of the owner of the property they may readily ascertain before they bestow their labor or material upon the improvement whether or not the incumbrances will be superior to their liens. They can easily learn the purpose for which the money was raised. If they discover that it was obtained for the purpose of making the improvement, they may refuse to contribute to the building, and may thus secure themselves against loss in any event. They cannot do so if the use or application of the proceeds is substituted for the purpose of the loan as the test of the superiority of the mortgages. Under that test the liens of prior incumbrances, which are not superior when the improvement is commenced, may, by the use of their proceeds in its construction, become superior as the building rises. A contractor or laborer will be unable to learn before he commences to contribute to the improvement what part of the proceeds of prior liens will be used in the construction of the building, and after he has furnished his material or performed his labor the proceeds of prior mortgages may be used in completing it, and thus superior liens may be fastened upon it which had not attached or become fixed when he contributed to the building, and which will ultimately sweep away all his security.

There is another consideration which ought to have weight to prevent this change in the statute. It is that such a change will render the security of mortgages more precarious and uncertain and will tend to compel borrowers to pay higher rates of interest to compensate for the less security of the mortgage liens. While these considerations are not in my opinion appropriate to the discussion of this question in the courts, they are worthy of serious deliberation by the legislature or by any other body which undertakes to change the terms and effect of this statute.

There is another conclusion of the court to which I am unable to assent. It is that the mortgagees were estopped from claiming that they had a lien even for the $3,000, which was actually invested in the

improvement, superior to that of Dyke Bros., notwithstanding the fact that their loan was made and their mortgage was recorded before the lien of the latter attached. The facts disclosed by the record upon which this conclusion is based are these: Harry E. Kelley was a broker and an agent for owners of real estate and for parties borrowing and loaning money in the city of Ft. Smith, in the state of Arkansas, where the mortgagor, Joe P. Matthews, resided. The mortgagees appear to be nonresidents of the state. Matthews made a written application to Kelley to procure for him a loan of $4,000 on his lot. By this application he appointed Kelley his agent, agreed to pay him for his services in procuring the loan, and that it was to be procured for the purpose of building a two-story stone or brick wholesale house upon the lot. Kelley obtained the loan of the mortgagees, and Matthews paid him out of the proceeds $200 for his services. For some ten years prior to this time Kelley had been the agent of the mortgagees to collect and foreclose their mortgages in the state of Arkansas, and had procured loans from them for borrowers who had appointed him their agent for that purpose by submitting to the mortgagees the written applications of the borrowers of the character made by Matthews in this case. This application was submitted to the mortgagees before they made the loan, and after it was accepted by them Matthews made his notes and mortgage on April 28, 1899. At the time when the mortgage was made Kelley placed the $4,000, which Matthews borrowed, to the credit of Matthews on his books, and subsequently paid it out on Matthews' orders. There was no evidence that the mortgagees had or exercised any control over the disposition of the money after the mortgage was made, on April 28, 1899, and the proof was undisputed that it was paid out upon the orders of Matthews. There was no understanding and agreement between Kelley and the mortgagees that the former should apply the money to the building of the house. But Matthews did not ask for the payment of all the money to him, all the parties to the transaction knew that it was borrowed for the purpose of erecting the house, and Kelley intended to see that it was applied to that purpose, for this was his practice when his customers borrowed money for the purpose of improving the property which they mortgaged. The lien of Dyke Bros. first attached to the property on June 19, 1899, more than a month after the mortgagees had transferred to Matthews the entire control of the money loaned and had recorded their mortgage. There is no controversy concerning the facts which have now been recited. But there is a direct conflict of testimony between two witnesses, M. T. Dyke and Harry E. Kelley, over the essential fact upon which Dyke Bros. relied to maintain their estoppel, and which is now to be considered. Mr. Dyke testified that after he procured the contract to furnish some of the lumber for this building, and before he delivered any of it, he asked Kelley: " 'What about the pay on it?' and he says, 'I have about $1,500 in my hands belonging to Mr. Matthews, and I will see that you get your money out of it;' " that he would not have furnished the lumber unless Kelley had made this statement, and that he did furnish it in reliance upon this conversation. Mr. Kelley testified that he never had any such conversation with Dyke, and that he never made

any such statement to him, and there is no other evidence in the case on the subject. The referee who heard these witnesses, observed their demeanor, and weighed their characters found that no such conversation took place, and that if it had it could not have estopped the mortgagees from insisting that the lien of their mortgage was superior to that of Dyke Bros. The district court reversed the finding of fact and conclusion of law of the referee, and rendered the decree which has been recited. Was this action warranted by the law and the evidence when this case came before the district court?

Let us consider first the question of fact. The mortgage was of record. The question whether or not this conversation took place had been submitted to and was decided by the referee under an agreement of the parties that he should determine all the questions of law and of fact relative to the superiority of their liens. The burden of proof was on Dyke Bros. to establish the conversation on which they relied by a fair preponderance of testimony, and they had no preponderance, for Kelley's testimony stands uncontradicted in the case by any witness except Dyke. More credence is and ought to be given to a disinterested than to an interested witness, and Kelley had no interest while Dyke's claim was at stake upon his testimony. The finding of a fact dependent upon conflicting testimony by a judge, a master, or a referee, who sees and hears the witnesses testify, has every reasonable presumption in its favor, and may not be set aside and modified unless it clearly appears that there was an error or mistake upon his part. Tilghman v. Procter, 125 U. S. 136, 149, 8 Sup. Ct. 894, 31 L. Ed. 664; Callaghan v. Myers, 128 U. S. 617, 666, 9 Sup. Ct. 177, 32 L. Ed. 547; Clyde v. Railroad Co. (C. C.) 59 Fed. 394, 399; Missouri Pac. Ry. Co. v. Texas & Pac. Ry. Co. (C. C.) 33 Fed. 803, 806; Hennessey v. Budde (C. C.) 82 Fed. 541, 542.

And where by agreement of the parties a referee or special tribunal is selected, or by consent parties submit to him their controversies for determination, his finding of the facts "so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, must be treated as unassailable." Davis v. Schwartz, 155 U. S. 631, 636, 637, 15 Sup. Ct. 237, 39 L. Ed. 289; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Crawford v. Neal, 144 U. S. 585, 596, 12 Sup. Ct. 759, 36 L. Ed. 552; Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821, 36 L. Ed. 649. The holders of these liens selected this referee as a special tribunal, and consented that the questions of fact and of law, which conditioned the rank of their liens, should be determined by him, and the rule announced by the supreme court in Davis v. Schwartz made his finding of fact here, which was supported by at least as much testimony as was deduced in opposition to it, conclusive of this issue. Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764, and Davis v. Schwartz, 155 U. S. 637, 15 Sup. Ct. 237, 39 L. Ed. 289. In the latter case the supreme court after declaring that a finding of fact in such a case was conclusive if there was any testimony to sustain it, and after discussing and reiterating the rule in Kimberly v. Arms, disposed of a like question which had arisen in that case in these words: "As the reference in this case was by consent

to find the facts, we think the rule in Kimberly v. Arms applies, and, as there is nothing to show that the findings of fact were unsupported by the evidence, we think they must be treated as conclusive." It seems to me to follow from these rules and decisions that whether the occurrence of the conversation upon which Dyke Bros. claim an estoppel is founded is considered as an original question, dependent upon the preponderance of evidence, and upon the interest, character, and demeanor of the witnesses, or as the finding of the referee whom the parties had selected and agreed to constitute a special tribunal to hear and determine their controversies, the finding of the referee that no such conversation took place was both right and conclusive, and should have been sustained by the court below.

Nor is the conclusion of law that if this conversation had taken place the mortgagees would have been estopped thereby from maintaining the superiority of their lien more tenable. An estoppel is a prohibition of one from denying the truth of some statement or representation of fact which he has made and upon which another has rightfully acted. It is nothing more and goes no further. It never prevents one from maintaining the truth concerning any fact relative to which he has made no misstatement or misrepresentation. The truth which Dyke Bros. seek to estop the mortgagees from asserting is that the lien of their mortgage was superior to the mechanic's lien of Dyke Bros. That mortgage was of record, and Dyke Bros. were charged with knowledge of its priority and superiority. The mortgagees never made any statement or representation that it was not or would not be prior or superior to the lien of these materialmen. Kelley had neither power nor authority to discharge the lien of the mortgagees nor to subordinate it to the liens of others, and no statement or representation which he made could have had any such effect or could have been binding upon them.

Again, if Kelley had been the mortgagee and had made the alleged statement to Dyke, still he would not have made any statement or representation that the lien of the mortgagees was not superior to that of Dyke Bros. If he said, "I have about $1,500 belonging to Mr. Matthews, and I will see that you get your money out of it," that statement contained no averment or representation that the lien of the mortgagees was not superior to any lien which Dyke Bros. had or could acquire upon the lot and building. It was nothing but a statement that he had $1,500 of Matthews' money, coupled with a promise that he would pay Dyke Bros. out of it. It would not be a denial of this statement to prove the first lien of the mortgagees upon the lot and building. That fact tends in no way to show that Kelley did not have $1,500, or that he would not see that Dyke Bros were paid. Hence the statement cannot estop or prohibit the mortgagees from establishing and maintaining the fact that their lien is superior to that of Dyke Bros., a truth which is neither directly nor indirectly denied by the terms of Kelley's alleged statement.

Moreover, there is no foundation for an estoppel in the statement. It is not claimed that the averment that Kelley had $1,500 of Matthews' money in his hands was not true. The only part of the conversation which is asserted to be false or to form the basis of an estop-

pel consists in the words, "I will see that you get your money out of it." But this is nothing but a promise, nothing but an executory agreement, and no estoppel can arise upon a promise or upon an executory contract coupled with a failure to perform it. The only remedy for such a failure is an action for specific performance or for damages for breach of the agreement. 2 Pom. Eq. Jur. § 808; Bigelow, Estop. p. 555; White v. Ashton, 51 N. Y. 285; Starry v. Korab, 65 Iowa, 267, 269, 21 N. W. 600; Railroad Co. v. Barnes, 64 Fed. 80, 82, 12 C. C. A. 48, 50.

A false representation or a concealment of an existing or present state of things is a sine qua non of an estoppel. Neither a promise nor a prophecy will sustain it, "for," as Mr. Bigelow well says, "if a party make a representation concerning something in the future it must generally be either a mere statement of intention or opinion, uncertain to the knowledge of both parties, or it will come to a contract with the peculiar consequences of a contract." In Maddison v. Alderson, 52 Law J. Q. B. 737, Lord Selborne said: "The doctrine of estoppel by representation is applicable only to representations as to some state of facts alleged to be at the time actually in existence, and not to promises de futuro, which, if binding at all, must be binding as contracts." So are all the authorities. There was no false statement, no misrepresentation of any fact, of any past or existing state of things, in the alleged conversation of Kelley, and hence it could not have worked an estoppel. The conclusion seems to me to be inevitable that under the evidence and the finding of the referee Dyke Bros. failed to establish the fact that Kelley made the statement upon which they relied, and that, if he had made it, it could not under the law have estopped the mortgagees from asserting the priority and superiority of their lien. No estoppel arose which forbade them from maintaining that the lien of their mortgage was superior in right to the mechanic's lien of Dyke Bros.

In my opinion the decree below should be reversed, with a direction to the court below to enter a decree in accordance with the finding of the referee that the mortgagees are entitled to a first lien upon the premises and the proceeds thereof for the entire amount of their mortgage debt and interest.